UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

EDWARD ROBINSON,

                                          Plaintiff,

                -vs-
                                          DECISION and ORDER
GARLOCK EQUIPMENT CO., RUSSELL DEAN,                       05-CV-6553-CJS
INC. and GARLOCK-EAST EQUIPEMENT CO.,

                                          Defendants.
_____

**APPEARANCES**

| | |
|---|---|
| For Plaintiff: | Bradley Kammholz, Esq.<br>Kammholz Law Firm<br>The Powers Building Suite 200<br>16 West Main Street<br>Rochester , NY 14614 |
| For Defendants: | Lauris Alan Heyerdahl, Esq.<br>Paul R. Smith, Esq.<br>Foley & Mansfield<br>250 Marquette Avenue Suite 1200<br>Minneapolis , MN 55401<br><br>Stanley J. Sliwa, Esq.<br>Sliwa & Lane<br>840 Main-Seneca Building<br>237 Main Street<br>Buffalo , NY 14203-2715 |

**INTRODUCTION**

    This diversity product liability case is before the Court on Defendants' motion (Docket No. 27) to barr the testimony of David Quesnel, Ph.D., Plaintiff's expert witness, because of a lack of testing. For the reasons stated below, the Court denies the motion.

**BACKGROUND**

On November 8, 2002, Plaintiff was injured by hot asphalt that sprayed him from what he claims was a defective spigot on a Lugger, an insulated tank for the temporary storage and distribution of roofing asphalt. Plaintiff alleges that when he turned the spigot on the Lugger, the entire spout turned toward him, and poured hot asphalt, at about 300° F, onto him, filling his work boots and causing him severe burns. Defendants are the designers, manufacturers, assemblers and marketers of the allegedly defective Lugger. Plaintiff is bringing three causes of action under New York law: (1) strict product liability; (2) breach of warranty; and (3) negligence. Dr. Quesnel wrote in his report that "[s]everal alternate designs are available which would have prevented this accident." (Quesnel Report, at 3.) He proposes four: a left-handed screw thread for either the valve mounting or the valve opening handle; the use of a jam nut and ordinary threads with a sealant; an integral flange on the valve body bolted to the tank; and bolted-on braces, a design "already in service in the field." (*Id*., at 3.)

Defendants are moving to preclude testimony by Plaintiff's expert on the ground that he has failed to test his hypothesis that the spout could have been prevented from turning, thus made safer, through alternative designs. Defendants argue that

> Mr. Quesnel confines his expert opinion to the issue of design defect but, as argued herein, that opinion is utterly unsupported by any indicia of reliability other than Mr. Quesnel's self-qualification. It is exactly the type of testimony that is intended to be barred by Federal Rule of Evidence 702 and *Daubert*.

(Def.s' Mem. of Law, at 1-2.) Defendants plan to offer their own expert's testimony. They intend to call Lester Engel, P.E., who engaged in testing "designed to mimic the accident dynamics" described by Plaintiff. Defendants contend that Mr. Engel,

> [u]sing an identical lugger and wrench (which was capable of measuring torque) and armed with measurements from the incident lugger, it was learned that 250 ft-lbs of torque were necessary to screw the spigot in to the same depth as that achieved by Mr. Robinson. To back the spigot out 180 degrees (as described by Mr. Robinson) required 150 ft-lbs of torque. Once set in that position, to rotate the cold spigot required 125 ft-lbs. (Engel Report, p. 6)

(Def.s' Mem. of Law, at 5-6.)

## STANDARDS OF LAW

Federal Rule of Evidence 702 provides as follows:

Rule 702.  Testimony by Experts

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702 (2000). The Supreme Court, in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), stated the following:

> Ordinarily, a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested. "Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry." Green[1] 645. *See also* C. Hempel, Philosophy of Natural Science 49 (1966) ("The statements constituting a scientific explanation must be capable of empirical test"); K. Popper, Conjectures and Refutations: The Growth of Scientific Knowledge 37 (5th ed. 1989) ("The criterion of the scientific status of a theory is its falsifiability, or refutability, or testability") (emphasis deleted).

---

[1] Green, Expert Witnesses and Sufficiency of Evidence in Toxic Substances Litigation: The Legacy of Agent Orange and Bendectin Litigation, 86 Nw. U. L. Rev. 643 (1992).

*Daubert*, 509 U.S. at 593. "Under *Daubert*…, the district court functions as the gatekeeper for expert testimony." *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997).

## ANALYSIS

Defendants do not dispute Dr. Quesnel's qualifications. Instead, their contention for this motion is that, since Dr. Quesnel did not himself test his proposed alternative design for the spigot, his testimony is inadmissible under Federal Rule of Evidence 702 and *Daubert*. The Court disagrees. The language in *Daubert* does not require that the hypothesis be tested by its proponent, only that it be can be tested. "*Daubert* does not require that a party who proffers expert testimony carry the burden of proving to the judge that the expert's assessment of the situation is correct." *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998). In *Small v. General Motors Corp.*, No. 05-131-P-H, 2006 WL 3332989 (D. Me. Nov. 15, 2006), the district court allowed Dr. Quesnel to testify regarding fan blade failure, even though he had not, himself, conducted any testing. Rather, the district court relied on the fact that Dr. Quesnel "made calculations based on well-known engineering principles and examined a number of failed…flex fans, discerning what, in his view, was a consistent failure pattern.…To the extent he could have strengthened that foundation by conducting testing, this goes to the weight, rather than admissibility, of his testimony." *Small*, 2006 WL 3332989, at *9 (citations omitted).

In this case, Dr. Quesnel was asked the following question and gave the following answer at a pretrial deposition:

> Q. Did you do anything to determine whether or not the force required to turn the spigot was less than twenty pounds?
>
> A. I did a conceptual thought experiment which would show me that the force necessary to unscrew the spigot could be as low as zero.

Q. Could you explain for me this conceptual thought experiment?

A. When a pipe thread, a tapered thread, has been used by other people in terms of describing this is threaded in to the point where it seals or to the final resting place of that particular thread then what happens is, because the pipe threads are tapered, the part that's being screwed in goes into a female hole that's also tapered and effectively the diameter at a particular cross-section of the male part gets bigger as it rotates in.

So essentially it's trying to put something into a hole that's getting bigger as it's rotating in and eventually the parts interfere with each other such that you need to apply more and more force to force it to continue to move in. Now, during that forcing operation there's some minor deformation of the threads. The threads essentially press into one another and help produce a seal that's essentially the purpose of this tapered thread in a pipe thread system, but the female part actually expands a bit.

It expands under the forces of elastic loads being applied by the male member as it's being rotated in and at some point the system is sort of released and it comes to equilibrium with a compressing force by the female member against an expanding force by the male member.

So the male member is being compressed by the female and the female is being expanded by the male and they're in intimate contact to make the seal.

If we now imagine in thought experiment that I alluded to that we produce a temperature gradient everyone realizes -- I think it's common knowledge that things get bigger when they get hot. So if we take the female member and raise its temperature relative to the male member then the female member will expand in its diameter.

Once it expands sufficiently it will no longer have this force against the male member and at that point it is as if the male member were finger tight.

So with that scenario in mind, applying a temperature gradient will reduce the force necessary to remove the component and with sufficient temperature gradient can produce essentially zero force to remove the component.

Q. What was that sufficient temperature gradient? …To get down to the finger tight.

A. That depends on the initial condition. So if it was finger tight to begin with

then it requires zero temperature gradient. If it's ten pounds of torque then it will be some small temperature gradients and as you increase the torque the temperature gradient gets progressively larger.

Q. Did you make a determination of what torque was required to get the spigot tight initially?

A. No, not a quantitative evaluation. In discussions with Mr. Robinson it was clear that he was actually the one who tightened the spigot in and that there was some issues about having to back the spigot up to produce the final resting location.

Q. So if we go back to the conceptual thought experiment and were attempting to determine what our starting point is, what did you assume that to be?….

A. The problem in a case like this is that if one makes a random assumption about the starting point the outcome will be dependent upon the assumption.

So, it does little good to create a data sheet that has random assumptions. It's best to be able to rely directly on experimental evidence.

Q. Being what?

A. Actually taking a hot tar lugger, putting the tar in it and measuring the torque necessary to unscrew a fitting, having previously measured the torque necessary to unscrew the fitting tightened to the same extent without the hot tar.

Q. And you didn't do that in this case?

A That would be far too expensive and it wasn't an option.

(Quesnel Dep., at 37-41.) As was the case in *Small*, Dr. Quesnel has based his theory on his expert knowledge of material scientific principles and of the properties of steel or cast iron, the metal involved in the Lugger. To the extent he could have bolstered his conclusions through conducting experiments, that goes to the weight the jury should give

the evidence, not its admissibility. Accordingly, the motion to barr Dr. Quesnel's testimony (Docket No. 27) is denied.

    IT IS SO ORDERED.

Dated:   January 13, 2009
          Rochester, New York

                ENTER:

                          /s/ Charles J. Siragusa
                          CHARLES J. SIRAGUSA
                          United States District Judge